Our third and final case is 24-4192, United States v. Gould. Mr. Coleman? Good morning, Your Honors. Lex Coleman on behalf of James Gould. Mr. Gould was a 50-year-old widower. He had a son in middle school, a daughter in her second year at WVU. Worked 25 years as a pipeline contractor. Between then and when his wife died, his parents had died, the business went bankrupt, and he ended up with four involuntary commitments that were preliminary commitments in a sense. West Virginia as a state has a preliminary finding. They're taken or admitted involuntarily to be both evaluated and treated, and then if someone feels anything else needs to be done, they move to the more formal proceeding and make a formal finding and can extend it beyond five days. My client never went beyond the preliminary admissions, but they definitely still met the 478.11 definition of what an involuntary commitment was under the ATF reg. Is there anything in the record that shows whether or not there was a finding that he was no longer a danger to himself or to others when he was released? No, sir. Not at all. We argued the probable cause finding and the district court acknowledged it in note six of the opinion, but no, the record's actually very thin on that. My client's position was he was released. The government never contested that, and there was never any documentation produced from the family or circuit court showing that he, in fact, had had a longer or a preliminary thing. But the law is, at least in West Virginia, they're not going to release him if they're still subject to danger to themselves or anyone else. Can I take a step back? Your client pleaded guilty, right? Yes, Your Honor. Why doesn't that waive an as-applied challenge? Everything you're saying, I mean, it could be atmospherics, totally fair, but if it's not just atmospherics, this sounds like an as-applied challenge, and why doesn't pleading guilty waive an as-applied challenge? Under class, Your Honor. Class says it doesn't waive a facial challenge. Where does class say it doesn't waive an as-applied challenge? It doesn't say it does. If the same reasoning would apply with a facial, why would it not apply with an as-applied? Well, hypothetically, to litigate a facial challenge, I don't need to know all sorts of facts about the defendant. To litigate an as-applied challenge, I need to know a bunch of facts about the defendant. Except when the defendant pleads guilty, we're not going to have a proceeding to determine all kinds of facts about the defendant. So it's one thing to say, like, I read class to say, I read your indictment, I agree that the conduct described in the indictment violates the statute, but I don't think you can constitutionally criminalize the conduct described in the indictment. That makes total sense to me. It seems weird to me, like, the whole point about when you plead guilty is you say, we're not going to look into your specific facts and circumstances because you're pleading guilty, and then to say, oh, it turns out, actually, as applied to my particular facts and circumstances, this is unconstitutional. Then let me simplify that. We narrowed it down to a facial challenge before the district court. Okay. Well, so then that means that other than atmospherics, anything we're talking about this gentleman is irrelevant, right? Correct. Okay. Again, that was more to introduce him, and I'll move on to the merits of the argument. Just as there was no dispute with Rahimi, I don't think there was as far as Bruin Step 1 as to James Gould. And the application of G4, I think, is going to come down to a Bruin Step 2, which has got multiple steps because of what happened between Heller, Bruin, and really Rahimi. The elephant in the room, I think, is going to be the presumptive, so the lawful language in Heller, and what do we do with that? I've put that in the briefing, but I can boil it down to several points. There was no G4 decision in this circuit between Heller and Rahimi. A bigger thing is that all congressional actions. What about Canada? Why is this case not? I'll tie that in. Actually, I'm very happy you're here on this panel, Judge Heitens, both because I have a question. I'll take that in the spirit in which I'm sure it's meant. It is meant that way, yes. Very much so. The Walters case from 1984, the U.S. Supreme Court, said that all congressional actions are presumptively lawful. And I didn't just come up with it myself. I heard it in the range oral argument with appellate counsel yesterday. And that's a very, very strong point. We do have this presumptively lawful language in Heller and the discussions of points that were not necessary to the outcome of that decision, but that presumption applies to all congressional pronouncements. So we think that when the Supreme Court said in Heller and then again in McDonald's and then again in Rahimi that certain laws were presumptively unconstitutional, they were simply expressing the uncontroversial proposition that all laws are presumptively constitutional? I think they were acknowledging that that's what we already presume based on the current process. No, no, but they don't. I mean, but that reads out the fact that Heller and McDonald and Rahimi identified a subset of laws as presumptively constitutional. They did not say all firearms laws are presumptively constitutional. That's true. Right. So they have to have meant something more than the background presumption that all laws are presumptively constitutional because otherwise I don't know why they keep saying the same thing over and over again. They don't say, for example, laws limiting possession of firearms by people who are left-handed are presumptively. That's not a real law. I take your point. But you know what I'm saying. There's lots of other categories of laws that regulate firearms that Heller and McDonald and Rahimi don't go out of their way to say are presumptively constitutional. Well, obviously it was before the courts before the court. They don't say that bans on high-capacity rifles are presumptively constitutional, for example. Well, I go to Canada and looking at Rahimi, and that's a question I had for you. You had noted that Rahimi reiterated prohibitions on the possession of firearms by felons are presumptively lawful. And you cite Heller. When I look at Rahimi, I've got Justice Roberts recognizing when Rahimi argued, hey, you've got a categorical prohibition against regulating guns in the home. And that's not true, Rahimi, because look at the Heller dictum. That doesn't apply. The only other justice in Rahimi that talks about the presumptively lawful language in Heller is Kavanaugh's big discussion of how history is so much better metric than policy. And that was in Rahimi. What about plurality in McDonald? Well, that was before Bruin. So this goes back to the argument that everything that happened before Bruin is basically we turn over the table and nothing before Bruin matters. I don't agree with that. Okay. Because the Supreme Court has said that. Right. Rahimi rejects that view pretty strongly. Correct. So we're down to functionally what have we got, and it's harmonizing is better because I don't think one excludes the other. The big thing about Bruin, I see, is it requires a historical analysis. If we go with the presumptively lawful language, that gets rid of a facial challenge that's out the door. Can I just ask you to address Judge Strass' opinion for the Eighth Circuit and why that doesn't just answer? Why is Judge Strass wrong? I'm sorry. The Eighth Circuit rejects a constitutional challenge to this precise statute. I think if it rejected a facial challenge, it would be because it has to apply in some situation. Correct?  But I guess what I'm saying is there is a published opinion by one of our sister circuits that rejects a facial challenge to this precise statute, and I'm asking why the reasons they give are wrong. I'm sorry, you'll have to remind me. Okay. So one of the things they rely on in history and tradition is there is, again, this is just a reality in the world in which we're having to do this, there is a history and tradition of taking people, at least some people, who have mental illness and just locking them up. And before the 1960s, we often did that without very much due process at all. But the court says there's a history and tradition of doing that. They also analogize mental illness. They say the way people would have thought at the time of the Second Amendment, you could think of mental illness as a form of temporary insanity. They analogize to cases involving people who are impaired by substances, such as alcohol or drugs, and they say there's a history and tradition of saying people who are intoxicated can't have firearms, and they say that is a sufficiently close analogy under the world we're doing. They say that. I mean, they literally reject a facial challenge to this precise statute. True. And the language of the statute, we get two different things with Heller. Heller uses mentally ill. This statute does something different and doesn't even define it, and then it takes an ATF reg to define it. The historical tradition that is consistent, even going back to the time of the founding, is with acute incidents of mental illness. They didn't treat mental illness as a permanent malady. It didn't make the assumption that G-4 makes, is that if you ever are involuntarily committed, you're unfit for the rest of the future no matter what. That's what G-4 does. The government, Judge Sutton put it in his concurrence in Tyler, that you're using a sky-high generalization to do a skin-deep assumption based on mental illness. But that's subject to the qualification that at least in some jurisdictions you're able to prove otherwise, right, your fitness to. . . My problem with G-4 is denying it to begin with. You've got the order to commit. What you said was once that finding is made, you're unfit permanently to have guns in your possession. That's what the statute. Yes, sir. Well, except for the fact that in a number of jurisdictions you can petition otherwise, right? So does that make a difference? Well, let me go through the history of that then. We've got 1986, the Farm Owners Protection Act, let us try and do something under 18 U.S.C. 925C. But by 1992, that was defunded and couldn't be used at all. Then we have the Virginia check shooting, and they want to improve the National Instant Criminal Background Check System. I don't know why they just call it NICS. And that was the 2,000 amendments with the grant program that's in Title 34, the 4,000, what, 901 through 915, 916 part of the code. That is a grant system where 3 to 10 percent of that goes to relieving firearm disabilities. If states will set it up and do it statutorily, it does not require them to do it, nor does it require them to restore anything. It's got a big if-but, which to me really mirrors the you've got to prove you have a right to have a gun, that was the whole shall issue, may issue distinction in brewing, and really tracks that, that it's more of a may issue, when you get into the ones that adopted it. Congress could have, and why it didn't, mandate it that the states, hey, you guys put up a restoration thing. But it's so inconsistent throughout the code, the amendments to the NICS apply to federal agencies as well as state. In the federal, if you are committed and you do the treatment and you are released, they don't report the record. They're not required to. In the states, they still are trying to get it in. So this whole system is inconsistent. Right, but you seem to be sort of toggling back and forth between an as-applied and facial challenge. The question is, is this statute in its most extreme or most favorable application by the government constitution, notwithstanding that there may be nuances across jurisdictions and across laws that might warrant a different result in a different case. The difference is in the two clauses of the statute of G4. A mental defective is a finding, and if you look at it, you've got to be a mental incompetent, can't manage your own affairs. It's something that is not a temporary thing. It's a finding that exists until it doesn't exist. Whereas with the involuntary commitment, you go in because there's a, whether it's probable cause or it's clear and convincing evidence, that you're a danger to yourself, you're a danger to somebody else. The mechanisms and procedures are there to keep you, and they do keep you until they presume you are not, and then you're released. That someone's deprived of a gun while they're under a commitment order and in a mental hospital, that makes plenty of sense. But that's not the language of the statute. The statute is in the past tense, have been subject to a commitment order. That order doesn't end until someone is deemed to no longer be a danger to themselves or the community, and yet we are depriving them lifelong without some potential thing down the road like the Mayschell issue. Mr. Collin, first of all, I owe you an apology because my staff pointed this out. I, as I suspect you, have a lot of Second Amendment challenges to federal laws in my head, and the case I cited to you that you were not, was not about G4, so I'm also going to spare you the need to point out a post-argument letter that I was wrong about what that case was about. That case was about G3, not G4. That's my fault. I'm sorry about that. And that's what threw me out of the discussion. That's 100% my fault, but could I ask you to follow up on the Chief's point, which is like a lot of what you were just saying strikes me as, wow, there probably are some people who might have some pretty compelling as-applied challenges to this statute, right? The example we sort of workshopped is like imagine someone who was, when they were in college, was involuntarily committed because they got extremely intoxicated one night, and it's 35 years later, and they've never had any mental health problems since then, and they've been a model upstanding citizen, and heck, maybe they got a security clearance from the FBI or something. Like, sure, saying that person can't lawfully possess a firearm might raise some really hard as-applied challenges. It's not clear, though, why there's no one that this statute can be constitutionally applied to. I get it. It has to do with the presumption that the mental state is the same after they're released at the time of commitment, and it is the mental state at the time of commitment that makes them dangerous and we should take the gun away. That has historical support. Whether someone is totally drunk and they take the gun away in the saloon or they're a raving loon out in the street who the constable takes in and they lock up until the spell is over. At the time of the founding, mental health was much more temporary than it's diagnosed with now and understood that way, and rights apply. And we're not talking about an answer. I'm really, really close to my red light. No, your red light is on. Sir? Your red light is on. Oh, I'm running over. The glasses help. As to why it wouldn't apply in any other context, it's the structure of the statute and how it defines the disability that makes it unfairly inapplicable and inconsistently applicable. I know that sounds as applied. It's not. It's facial across the board. Can Congress come up with something that would address the danger consistent with the Second Amendment, Bruin, and Rahimi? Yes, it can. There's an historical tradition that would support it. It's just that G4 is not it. Thank you very much. Yes, sir. Thank you. Mr. Price? May it please the Court, my name is Gabe Price and I'm representing the United States in this case. 18 U.S.C. 922 G4 is constitutional for two main purposes, two main reasons. First is the presumptive lawfulness language that the Supreme Court has repeatedly stated throughout all of the Second Amendment opinions over the last decade. And second, the history and tradition of this nation have the underlying principle that those that have been found to pose a danger to society or others can be constitutionally disarmed, and that's the underlying principle from which we deal. How do you deal with, so let me preface, I know that we don't read Supreme Court opinions like statutes. The Supreme Court has told us not to read Supreme Court opinions like statutes. I can assume that you've already given me that response. But what the Court has said is you can disarm felons and the mentally ill. There's a history and tradition of disarming long-standing felons and the mentally ill. Like sort of once a felon, always a felon, that totally makes sense. A felon is a person who has been convicted of a felony. That's what the definition of a felon is. The mentally ill sounds like a person who is presently mentally ill. And I take Mr. Coleman's point to be maybe the first clause of this can be plausibly thought as applying to the mentally ill. But saying any person who has ever been involuntarily committed is irrebuttably presumed to be mentally ill for the rest of their life does seem odd. I understand Your Honor's point. However, in a facial challenge, I think that looking at the statute as a whole, that there would be a subset of those that are being involuntarily committed that are mentally ill as well. Okay, but that's an important concession because you raised in your brief the John Hinckley example, and they come back and say the John Hinckley example doesn't work because John Hinckley is covered by what I'll call the first clause of 924G4. Right? And I would disagree with that characterization. I think he's covered under both clauses because But you agree. I guess what I'll say is there doesn't seem to be any reason that 924G4 couldn't be further subdivided into Romanet I and Romanet II, Romanet I being people who have been adjudicated mentally incompetent, Romanet II being people who have been ever committed. Right? And I guess what I'm saying is the government is not arguing that he can't make a facial challenge just to what I'm calling Clause 2.  And I don't know if this wasn't briefed as far as whether 922G4 can be subdivided based on the or within those two clauses. Well, for purposes of a facial constitutional challenge. Yeah. It may be. I guess what I'm saying is the fact that, it strikes me, Mr. Coleman agrees with you, that there are certainly instances where this can be constitutionally applied to people who have been adjudicated mentally incompetent. But that does not in and of itself end this facial challenge.  I think that in this scenario, I think that would end the facial challenge based on the fact that you can still be mentally ill when you're being involuntarily committed as well. So the involuntary commitment does have some application in which the mentally ill would be committed to the mental hospital. And it's that finding of dangerousness along with the mental illness that would raise the presumption language. I really don't understand that answer at all. I guess what I'm saying is just because, I'm not in a strong sense making Mr. Coleman conceding this, but let's say Mr. Coleman concedes there's at least one person on earth who can be constitutionally disarmed because they have been adjudicated mentally incompetent and their competency has not been deemed restored. That does not mean that this client cannot raise a facial challenge just to the part of the statute that says, simply because I've ever been committed is not a valid basis for depriving me of my Second Amendment rights for the rest of my life. Yes, I think Your Honor is right there where there may be a section where the mental defective part, first part of the statute could be facially unconstitutional. Well, I think that's facially constitutional under the presumption language. Sorry, I know you believe that it's facially constitutional. I'm just saying, conceptually speaking, the answer could be different when it comes, do you see what I'm saying? You can subdivide, there's no rule that says if you're going to facially challenge 922G4, you have to show the entirety of 922G4 as facially unconstitutional. Yes, I think I understand what Your Honor is asking. You can make a separate facial challenge to the first prongs and the second prongs. I just don't feel that he has in this section. This court recently, with both Your Honors on the Canada opinion, talked about that presumptive language with Fountas. And that, again, that presumptive language from the Supreme Court, although maybe dicta, it really was given substantial deference by this court. And I think continuing to give it substantial deference. Not just in Canada, but we've got a couple of recent embanks that also do that too, right? The Maryland shall issue case, which looked at the dicta of the shall issue regime, also said that we give, that this court gives substantial, if not near, controlling deference to Supreme Court dicta. What does that language mean in the context of someone who's been voluntarily committed for mental illness? And, of course, you know, I'm certainly not a doctor, but my understanding of mental illness is something that you confront over the course of your lifetime. And in the case of Mr. Gould, it appears that he'd had his ups and downs. He'd been committed four separate times. And as Mr. Coleman indicates, each time he had been released, presumably because he had been treated and was now in a much better state than he was when he went in. And so the question is, does a presumption mean that apply only to those who are, at the moment in time, a danger to themselves or others? Or does it apply simply to the label of suffering under a mental illness? Because if that's the case, I suspect there are a good number of people in this courtroom who might be a judge unable to have a gun. And I agree. Mental illness is something that is a lifelong struggle. And I think when we're talking about the language that the Supreme Court is using, the presumptive lawfulness of mental ill, they had to have been talking about 922G4. Meaning someone who's been voluntarily committed? I believe that would be covered by what they said. Right. But Mr. Coleman's argument is that that speaks in the past tense. Presumably, if someone is no longer voluntarily committed, the state has made some showing or has made a determination that he or she is no longer a danger to himself or others. Now, there may be a distinction between someone no longer being a danger to himself or others and someone who might pose a danger if he or she had a firearm. Maybe that's the distinction that we make. And I think that is a distinction. And in cases where you have somebody who has specifically been found to be a danger to others that led to that involuntary commitment, that is what leads to the deprivation of the ability to possess a firearm. Unlike Bruin, and Bruin really talked about you start off with the presumption that you're not entitled to a firearm unless you have the special need requirement met in your licensing. Here, everyone starts off with the ability to possess a firearm. It's once that finding is made under 922G4 that you then lose the ability to possess a firearm. And you can regain that under West Virginia law, under, in my brief I cited, 33 different states have laws for the ability to have that showing that you are no longer a danger. Right. But take Mr. Rahimi in the domestic violence order case. If there ever was someone who probably should be deprived of handguns for a long time but not permanently, it would seem to be him. But yet, in that case, assuming he had not possessed a weapon during the time that the order was in place, if he had simply waited until the end of the expiration of the order by operation of law, assuming there were no other disabilities to his having a handgun, he would have been entitled under the Second Amendment, right, to carry a weapon. The difference here is the onus is being put on the petitioner to prove his case, to show otherwise. If the onus is put on the petitioner to show that he's no longer a danger. Isn't that problematic under the Second Amendment? I don't believe so, Your Honor. The Second Amendment in the Supreme Court cases, they have allowed or looked at what is the tradition and history of the Second Amendment, what is the tradition of the disarming and not looking at a specific historical twin, but what is the underlying principle. And the underlying principle that Rahimi identified is that those that have been found to be a danger to others or to society can be constitutionally disarmed. And in this case, under a G-4 analysis, they have that finding. So they can be constitutionally disarmed. How it comes about as far as regaining their ability to possess the firearm, whether it be automatic, similar to the way it was in G-8, or whether they have to have that showing themselves, would not necessarily affect the facial constitutional statute. That may be an as-applied statute where, let's say somebody, I think the hypothetical was 35 years ago, got intoxicated, got involuntarily committed, has not had any problems for 35 years. They go into court and ask, I want to restore my Second Amendment gun rights. They have an expert, a doctor that says they are no longer a danger. And the court still says no. At that point, you have, I think, a very good as-applied challenge to the statute. But when we're looking at the facial constitutionality of the statute, we have to look at whether this statute, whether there's any constitutional application to this statute. And so looking at that, whether the onus is on the person to regain their rights or whether it's automatic, I don't think is really an important analysis of the historical tradition within the Second Amendment rights. Looking at, turning to what Rahimi really says, and Rahimi says that, again, the underlying basis being looking at those who pose a danger to others can be constitutionally disarmed. And they said that the Second Amendment, they didn't suggest that the Second Amendment prohibits the, that Congress is not allowed to create classes of dangerousness within their legislation. They were very clear that Rahimi was not limited to those only that have been found to pose a danger. But the Supreme Court did find that those who pose a danger, such as Rahimi, in a G-8 situation, that those statutes would be constitutional. Under G-4, we have the similar rationale, the similar basis. We have similar historical laws, such as the surety laws, the going-arm laws. We have, as Your Honor mentioned, laws that in. But aren't the, I mean, the problem becomes, it's like the, it's the proxy issue. I take your point that Rahimi does not say dangerousness and only dangerousness, although I don't know that Rahimi also doesn't say, like, I think Rahimi leaves open the question about whether things beyond dangerousness are good enough. But Rahimi does very clearly say dangerousness is good enough. But then the question is whether the thing the legislature has chosen is a good enough representation or proxy for dangerousness. And, I mean, by that matter, like, this seems like a harder case than Rahimi in that sense. Because in Rahimi, it's like, is there a good enough proxy for dangerousness? Like, well, someone found you were dangerous kind of recently. That's a pretty good proxy for dangerous. Putting aside the due process issues that were sort of motivating some of the concerns in Rahimi. But assuming that that initial proceeding was done in a due process-y way, the fact that there's been a finding you're dangerous is a pretty good proxy for the fact that you're dangerous.  Whereas here, we're using the fact that you, and again, the fact that you've been adjudicated mentally incompetent and your competence hasn't been restored seems like probably a pretty good proxy for dangerousness. The fact that you've ever been involuntarily committed in your life, like, how good a proxy for dangerousness is that? Well, and I think it's not a proxy. I guess when we're talking about proxy for dangerousness, in the involuntary commitment in which the statute operates, there has to be that finding of dangerousness. Well, there was a finding at some point in the past. But it might be 35 years later now. And it might be six months later. And that's where my argument as to a facial channel versus as applied. Rahimi, it's- To a person who was released from a mental institution literally yesterday, and I could imagine released- So when the folks are deciding whether to release people from a mental institution where they've been involuntarily committed, the chief is, I think, quite right that you have to decide, are they dangerous? My hypothesis would be that the mental health professionals at those facilities would be, well, this is a person who, when released, is not going to be allowed to have firearms. And if you were to tell me that this is a person who is allowed to have firearms, I might make a different decision about whether to release them. Is that one possibility? I think that's absolutely a possibility. And I think that's why, in looking at this on the facial challenge side, you have to consider all of those possibilities. You have to consider whether some- And there's nothing in the record as to why Mr. Gould was released in this case. And being a facial challenge, that's not- To use the John Hinckley example, it strikes me as almost impossible to imagine that the people who decided to release John Hinckley did not take into effect that it would be illegal for him to have a gun after he was released. I agree with Your Honor. I think that's a fair point, and I think that supports the argument that it is facially constitutional because there are some aspects where that finding of dangerousness, even after release, would still not dissipate. And because it hasn't dissipated, and there is the procedure that there is a finding, there can be a finding of non-dangerousness after the fact, supports the inference that the finding of dangerousness does continue until that subsequent finding is made for purposes of the Second Amendment. Looking at the history and tradition and the different laws, and I know Your Honor brought up, I think it was Beasley out of the Eighth Circuit, which is cited in my brief for the G-3 case, they really do rely on G-4 and the historical analysis behind what makes G-4 constitutional. And they were looking at the distinction. You're doing a very nice job of making me feel better about getting confused. And I understand why you got confused because the majority of that opinion was about G-4. It really delved into the history behind that, and I think Beasley is one of the best cases for the government in this scenario that show why G-4 is constitutional with the historical basis. Based on all of the language the Supreme Court has said, giving presumptive lawfulness to the prohibition of firearm possession by those that are mentally ill, and based on the historical tradition of disarming those that pose a danger to others, the government would ask that this court affirm the district court's judgment in this case. Thank you very much. Thank you. Mr. Coleman, you've got some rebuttal time. Yes, thank you. Two quick points that in our questioning I wanted to remind the court. Bruin requires an historical analysis, a consultation of history. If we as courts, litigants, the government, just go with the presumptively lawful finding, we don't just relieve the government of the burden that Bruin and Rahimi put on them. We relieve the court. There's been no historical analysis, certainly by this court, by the Supreme Court, going into either G-1 or G-4 or convicted felons. Well, this court has, obviously, but you know what I'm saying. So that is important is that if we've got to be real careful with it as Bruin and Rahimi, it's not that they displaced everything before, but you're right, it's evolved. They've acknowledged it's evolved. We're not overturning it, but it's changing it. Rahimi pretty much got rid of the whole distinctly similar analysis that Judge Thomas started with, requiring a really tight fit with historical analogs, to really expanding on the relevantly similar where we are now. Even applying that to either Veazey's precedents or the government's, they just don't fit that. Not G-4. So your friend on the other side suggested that when the court in Heller said longstanding prohibitions on firearms by the mentally ill, they must have been thinking about G-4. What is your response to that? I've studied Justice Scalia for years, and I never could read his mind. What do you think they might have been? I guess the only thing that strikes me as totally inadmissible is that they didn't have anything in mind. So the question is what do you think they could plausibly have been referring to? When I saw the play between Justice Scalia and Stevens in that opinion, and they're going back and forth, I saw Justice Scalia focusing on honing in on the individual right and taking some not very deep responses to the attacks to get that court holding through. Heller was in 2008. The Gun Control Act is 1968. That's only 40 years. You add now up through Rahimi, that's 56. Could that really have been longstanding? But they said it. He did say it. And I took it at face value as an advocate and a lawyer going, wow, he obviously, Justice Scalia, he knows something I don't, until I started researching it. And that lends credence more to the criticisms that this is not the holding of the court, and the bigger guidance is at the end of the opinion when he says it's our first foray into this. We don't presume to answer all the questions. There will be time to expand upon the historical basis of this later. And that's what we're doing. And so what do we do with the historical tradition, as it were, that, again, this is probably an overgeneralization, but, like, there's a sense in which for a long time, again, what we did when people had serious mental illness, again, this is not good, and we don't do this anymore by and large, and it's a good thing that we don't do this anymore. We just shoved them somewhere and threw away the key and just left them there for the rest of their lives. I mean, we did that, right? I know we did it in early parts of the 20th century, certainly after the Depression. It was much more private and in-home. You hear the stories. I grew up in the South. There was somebody in the family who had a spell, or there was Aunt Matilda. And I guess my premise here is that when we did that to people, they were not allowed to have firearms where we put them, right? Not where we put them, no. And I guess what I'll say is, and now you could make the argument that the greater doesn't include the lesser, except Brahimi endorses a version of the greater includes the lesser, right? If you can do the worse thing, you can do the lesser thing. That's a move the court makes in Brahimi. Well, Brahimi is really focusing on the temporary, and if that were true, it would have been so easy to go to the bigger to justify this without having to grab from a civil and a criminal regime to justify a temporary ban that you don't even need an order to end. If the order expires, so does the disability. And it's kind of like Judge Neumeier said about drugs back in Carter in 2012. Stop using drugs and you can have a gun. So here we are with this. The commitment order ends, yet the statute is permanent. We might have something to talk about where you could be, but until you get it, you're basically as a citizen having to, who's supposed to have the right for self-defense, having to push another rock up a hill to hopefully get it back, when frankly you shouldn't have lost it in the first place except when you were locked up. And the statute, the way it's structured, speaks to after. And if they're releasing you, someone's decided who's qualified, be it a judge or a doctor, that you're no longer a danger to yourself or anyone else. And getting to John Hinckley, he was committed for 25 years. I don't know that whether he could have a gun or not factored into any of it. He was heavily supervised. He did his guitar tour. And I would think after that period of time, whether he shot President Reagan originally or not, that the doctors were satisfied he was not a danger or they wouldn't even have brought it up. So my time is up. I appreciate your attention. Thank you, Mr. Fuller. I appreciate the arguments by both counsel in this case. We'll come down and greet you. We do have some high school students in the audience, and we are going to talk to them after we're done. But unfortunately, unlike the younger people in the audience, Mother Nature is calling for me. So we're going to take a five-minute recess, and then we'll come back and chat with you. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Albert Diaz, Toby J. Heytens, DeAndrea Gist Benjamin